UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| INTERSCOPE RECORDS, MOTOWN RECORD COMPANY, L.P., and UMG RECORDINGS, INC., | ) ) ) | CV 10-1662 SVW (PJWx) |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSES [123] |
| TIME WARNER, INC., WARNER BROS. ENTERTAINMENT, INC., WARNER BROS. DOMESTIC TELEVISION DISTRIBUTION, INC., WARNER BROS. TELEVISION, TELEPICTURES PRODUCTIONS, INC., WAD PRODUCTIONS, INC. (d/b/a "THE ELLEN Degeneres SHOW"), A VERY GOOD PRODUCTION, and CRAZY MONKEY, INC. (d/b/a A VERY GOOD PRODUCTION), | ) ) ) ) ) | |
| Defendants. | | |

I.   **INTRODUCTION**

Plaintiffs Interscope Records, Motown Record Company, L.P. and UMG Recordings, Inc. (collectively, "Plaintiffs") filed the present copyright infringement action against Defendants Time Warner, Inc., Warner Bros. Entertainment, Inc., Warner Bros. Domestic Television Distribution, Inc., Warner Bros. Television, Telepictures Productions, Inc. (d/b/a "The Ellen Degeneres Show"), A Very Good Production, and

Crazy Monkey, Inc. (d/b/a A Very Good Production) (collectively, "Defendants") on September 9, 2009.  A Second Amended Complaint ("SAC") was filed on April 12, 2010.   The SAC generally alleges that Defendants create, produce, distribute and/or broadcast the popular daytime television show called "The Ellen Degeneres Show" ("the Show") and that the Show has repeatedly used Plaintiffs copyrighted sound recordings in various formats without obtaining any licenses to the sound recordings.

Defendants filed their First Amended Answer ("FAA") to the SAC on May 7, 2010.  Defendants have asserted ten affirmative defenses, most of which are based generally on the following allegations: (1) that Plaintiffs knew for years that Defendants were using their sound recordings on the Show; (2) that Plaintiffs benefitted from such use through increased sales of copies of the sound recordings; (3) that Plaintiffs encouraged the Show to use their sound recordings; and (4) that Plaintiffs provided copies of the sound recordings to Defendants with knowledge that such sound recordings would be played on the Show and without demanding that Defendants acquire any licenses.

On May 18, 2010, Plaintiffs filed a Motion to Strike under Federal Rule of Civil Procedure 12(f).  Plaintiffs seek an Order striking: the First Affirmative Defense of implied license; the Third Affirmative Defense of laches; the Fourth Affirmative Defense of consent; the Fifth Affirmative Defense of copyright misuse; the Seventh Affirmative Defense of estoppel; the Eighth Affirmative Defense of waiver; the Ninth Affirmative Defense of unclean hands, and the Tenth Affirmative Defense of failure to mitigate damages.  The Motion came before the Court for a hearing on June 21, 2010.

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART the Motion to Strike.  The Court DENIES the Motion to Strike as to Defendants' First, Third, Seventh, Eighth, and Ninth affirmative defenses.  The Court GRANTS Plaintiffs' Motion to Strike the Fifth affirmative defense WITH LEAVE TO AMEND.  Finally, the Court GRANTS Plaintiffs' Motion to Strike the Fourth and Tenth affirmative defenses WITHOUT LEAVE TO AMEND.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' Second Amended Complaint alleges that, since the inception of the Ellen Degeneres Show ("the Show") in 2003, Defendants have used Plaintiffs' copyrighted sound recordings on the Show without obtaining a license or permission from Plaintiffs.  Plaintiffs allege that Defendants have infringed upon their copyrights for hundreds of sound recordings.  (See SAC, Exh. A.)  Plaintiffs assert causes of action for:  (1) copyright infringement under the federal Copyright Act, (2) violation of California Civil Code § 980(2), and (3) violation of California's Unfair Competition Law, Business & Professions Code § 17200 et seq.  Plaintiffs seek statutory damages, or in the alternative, actual damages and Defendants' profits, restitution, punitive damages, and injunctive relief.

Defendants filed their First Amended Answer to the SAC on May 7, 2010.  Relevant to the current Motion to Strike, the First Amended Answer ("FAA") alleges that, "since the Show's inception in 2003, UMG and the other major record labels knew that the Show was playing their sound recordings but did not require Defendants to pay for master licenses for those recordings."  (FAA at 2.)  Defendants allege that "UMG actively encouraged the Show to use its recorded music" so that

the artists could profit from the Show's popularity.  (Id. at 2.)  UMG allegedly provided the Show with copies of their sound recordings and encouraged Defendants to play such music on the Show, knowing all along that the Show was not paying for formal master-use licenses.  (Id. ¶ 54.)  Defendants allege that "UMG's promotional people regularly called the Show's staff to urge them to use particular recordings."  (Id. ¶ 54.)  The FAA further alleges that UMG's artists have made hundreds of live appearances on the show, which were requested and promoted by UMG, and that UMG executives and employees regularly attended tapings of the Show.  (Id.)

Defendants allege that UMG benefitted enormously from the Show's use of its sound recordings, and that UMG specifically told the Show's producers that the use of their sound recordings in the "dance over" segment of the Show – where the host dances over from the center of the stage to her desk after the opening monologue – boosted CD sales.  (Id. ¶ 51.)  Defendants allege four specific examples of instances where the sales of Plaintiffs' copyrighted sound recordings increased markedly after the artists appeared on the Show.  (Id. ¶¶ 52-53.)

Finally, Defendants allege that UMG did not demand that the Show pay for licenses or cease using Plaintiffs' recorded music until February 2009, when UMG had agreed with other record labels to jointly pursue payment for master-use licenses from the Show.  (Id. ¶¶ 60, 62.)

On the basis of these allegations, Defendants assert the following affirmative defenses: (1) implied license, (2) statute of limitations, (3) laches, (4) consent, (5) copyright misuse, (6) failure to state a claim, (7) estoppel, (8), waiver, (9) unclean hands, and (10) failure to mitigate damages.  Plaintiffs now seek to strike under Federal Rule

of Civil Procedure 12(f) the First, Third,[1] Fourth, Fifth, Seventh,

Eighth, Ninth, and Tenth affirmative defenses.

**III. ANALYSIS**

    **A.   Legal Standard**

    Federal Rule of Civil Procedure 12(f) provides that, within 21

days after being served with a pleading, a party may make a motion to

strike any "insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter."  The purpose of a Rule 12(f) motion

is to "avoid the expenditure of time and money that must arise from

litigating spurious issues by dispensing with those issues prior to

trial."  <u>Fantasy, Inc. v. Fogerty</u>, 984 F.2d 1524, 1527 (9th Cir. 1993),

*reversed on other grounds*, 510 U.S. 517 (1994).

    As with a motion to dismiss for failure to state a claim, the

grounds for the motion to strike must be apparent on the face of the

pleading under attack or from matters which the court may judicially

notice.  <u>S.E.C. v. Sands</u>, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995).

The court must view the pleading in the light most favorable to the

pleader and resolve all doubts as to the sufficiency of a defense in

defendant's favor.  <u>Lazar v. Trans Union LLC</u>, 195 F.R.D. 665, 669 (C.D.

Cal. 2000); <u>Mag Instrument, Inc. v. JS Prods. Inc.</u>, 595 F. Supp. 2d

1102, 1106 (C.D. Cal. 2008).  In pleading an affirmative defense, the

party must comply with Federal Rule of Civil Procedure 8's requirement

of a "short and plain" statement and give the opposing party fair

---

[1] Plaintiffs' initial Motion to Strike did not address the Third Affirmative Defense of laches.  However, at a hearing on June 14, 2010 on a related discovery motion, Plaintiffs' counsel argued that the laches defense failed as a matter of law and thus discovery as to that defense should not be permitted.  In response to this argument, the Court requested that the parties brief the issue of the validity of the laches defense, which they did in mid-June 2010.  (Docket Nos. 139, 140, 142). The Court has read and considered all of the supplemental briefing and related declarations regarding the laches defense.

notice of the defense.  <u>Mag Instrument, Inc.</u>, 595 F. Supp. 2d at 1107.
Additionally, although no circuit court has expressly held that the
pleading requirements of <u>Bell Atlantic Corp. v. Twombley</u>, 550 U.S. 544
(2007) and <u>Ascroft v. Iqbal</u>, 129 S.Ct.1937 (2009) apply to affirmative
defenses, the majority of district courts addressing the issues have
concluded as much.  <u>See</u> <u>Hayne v. Green Ford Sales, Inc.</u>, 263 F.R.D.
647, 650 n.14 & 15 (D. Kan. 2009) (collecting cases); <u>see</u> <u>CTF Dev.,</u>
<u>Inc. v. Penta Hospitality LLC</u>, No. C. 09-02429 WHA, 2009 WL 3517617, at
* 7-8 (N.D. Cal., Oct. 26, 2009) ("Under the <u>Iqbal</u> standard, the burden
is on the defendant to proffer sufficient facts and law to support an
affirmative defense.").  Thus, an answer must contain sufficient
factual matter, accepted as true, to state a defense that is plausible
on its face.  <u>Twombley</u>, 550 U.S. at 570.

      The Court has broad discretion when considering a motion to
strike; however, such motions are generally disfavored and infrequently
granted.  <u>Stanbury Law Firm v. I.R.S.</u>, 221 F.3d 1059, (8th Cir. 2000);
<u>see</u> <u>Lazar v. Trans Union LLC</u>, 195 F.R.D. 665, 669 (C.D. Cal. 2000).
Where the motion challenges the sufficiency of a defense, it should be
granted only where the court is "convinced that there are no questions
of fact, that any questions of law are clear and not in dispute, *and*
*that under no set of circumstances could the claim or defense succeed*."
<u>RDF Media Ltd v. Fox Broadcasting</u>, 372 F. Supp. 2d 556, 561 (C.D. Cal.
2005) (emphasis added); <u>Stanbury Law Firm</u>, 221 F.3d at 1063 (striking a
party's pleadings is "an extreme measure"); <u>Lazar</u>, 195 F.R.D. at 669
("Motions to strike are generally not granted unless it is clear that
matter to be stricken could have no possible bearing on the subject
matter of the litigation."); <u>William Z. Salcer, Panfeld, Edelman v.</u>

Envicon Equities Corp., 774 F.2d 935, 939 (2d Cir. 1984) (motion to strike based on insufficiency of a defense "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense."); Charles Alan Wright & Arthur R. Miller, 5C Federal Practice and Procedure § 1381, at 421-425 (motion should be denied if "the insufficiency of the defense is not clearly apparent, or if it raises factual issues that should be determined on a hearing on the merits.")  Moreover, "[e]ven when the defense seems to present a purely legal question, federal courts are very reluctant to determine . . . substantial issues of law on a motion to strike; these questions quite properly are viewed as best determined only after further development by way of discovery and a hearing on the merits . . . ."  Wright & Miller, 5C Federal Practice and Procedure § 1381, at 424-25.

### B.   Application

#### 1.   Implied License Defense

Plaintiffs assert two arguments in support of their motion to strike Defendants' implied license defense.  First, Plaintiffs contend that Defendants' allegations, even if true, fail under Ninth Circuit law to establish that Plaintiffs granted Defendants an implied license to use their copyrighted sound recordings.  Second, assuming an implied license defense is tenable, Plaintiffs argue that the defense lacks the requisite specificity because Defendants only state facts in support of an implied license defense with regard to *some* of the sound recordings; the allegations are not sufficient to establish a blanket implied license for all of the copyrighted sound recordings at issue.

7

### a.   Requirements of an Implied License

Plaintiffs argue that, under Ninth Circuit law, the implied license defense can only survive where the facts demonstrate that three specific requirements are met: (1) that the plaintiff (licensor) created the work at issue at the defendant's (licensee's) request; (2) that the plaintiff made the particular work and delivered it to the defendant who requested it; and (3) that the plaintiff intended that the defendant copy and distribute his work.  (Mot. at 5-7).  In support of this argument, Plaintiffs cite this Court's opinion in Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197 (C.D. Cal. 2007), which in turn cited to A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001), as well as Effects Associates, Inc. v. Cohen, 908 F.2d 555, 556-67 (9th Cir. 1990) and Catalogue Creatives, Inc. v. Pacific Spirit Corp., No. CV 03-966-MO, 2005 WL 1950231, at *2-3 (D. Or., Aug. 15, 2005).  Plaintiffs contend that Defendants "do not allege (nor can they) that Plaintiffs created their copyrighted sound recordings at Defendants' request, or for Defendants' benefit;" thus, the implied license defense fails as a matter of law.[2]

Plaintiffs' argument adopts an overly restrictive view of the law of implied license.  While it is undoubtedly true that most cases in which an implied license is found satisfy the three-part test proffered by Plaintiffs, an implied license defense is not precluded in other circumstances.  As a leading treatise explains: "A nonexclusive license may therefore be granted orally, or may even be implied from conduct.

---

[2]  Defendants do not dispute that if in fact the test put forth by Plaintiffs were correct, the implied license defense would fail.  Rather, Defendants contend that Plaintiffs have misstated the law.

*Where the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license.*"  MELVILLE B. NIMMER & DAVID B. NIMMER, NIMMER ON COPYRIGHT § 10.03[A][7] (revised ed. 2009) (emphasis added); <u>see</u> MILGRIM ON LICENSING § 5.41 (2010) ("Under certain circumstances, the conduct of the copyright owner combined with . . . copying on the basis of [the infringer's] reasonable reliance that it was authorized to do so, may create a situation in which a license will be implied . . . .").  Whether an implied license exists is ultimately a question of contract law, and as with any implied-in-fact contract, the issue depends upon the objective manifestation of consent under the totality of the circumstances.  <u>See Foad Consulting Group, Inc. v. Azzalino</u>, 270 F.3d 821, 832 (9th Cir. 2001); <u>Effects Associates, Inc. v. Cohen</u>, 908 F.2d 555, 559 n.7 (9th Cir. 1990); <u> Field v. Google, Inc.</u>, 412 F. Supp. 2d 1106, (D. Nev. 2006) ("Consent to use a copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it."); <u>Keane Dealer Servs., Inc. v. Harts</u>, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) ("Consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license"); <u>see also</u> <u>De Forest Radio Telephone & Tele-Graph Co.</u>, 273 U.S. 236, 241 (1927) ("No formal granting of a license is necessary in order to give it effect.  Any . . . conduct on [the owner's] part exhibited to another, from which that other may properly infer that the owner consents to his use of the patent . . . constitutes a license . . . .").[3]

---

[3]  Although <u>De Forest Radio Telephone & Telegraph</u>, 273 U.S. 236, is a patent case, the Supreme Court in <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 936-37 (2005), found that in certain instances it was both sensible and appropriate to borrow principles from patent law when resolving issues of copyright infringement.

Plaintiffs' argument derives largely from a misreading of <u>Effects Associates, Inc. v. Cohen</u>, 908 F.2d 555 (9th Cir. 1990).[4]  In <u>Effects Associates</u>, the defendant movie producer hired the plaintiff, a small special effects company, to create footage to enhance certain sequences in a film.  <u>Id.</u> at 556.  Plaintiff agreed orally to the deal and created seven shots for the film, which were delivered to defendant. <u>Id.</u>  No one said anything about who would own the copyright in the footage when making the deal.  <u>Id.</u>  After the shots were delivered, Defendant paid plaintiff part of the agree-upon price, $56,000, but was unhappy with one of the shots and refused to pay some $8,000 for it. <u>Id.</u>  In response, plaintiff brought a copyright infringement action alleging that defendant had no right to use the shots in the film unless he paid the full contract price.  <u>Id.</u>

The Ninth Circuit rejected plaintiff's copyright infringement claim.  Citing to the Copyright Act § 101, the court noted that, while transfers of ownership of copyrights must be in writing, "a nonexclusive license may be granted orally, or even be implied from conduct."  <u>Id.</u> at 558 (citing NIMMER ON COPYRIGHT § 10.03[A], at 10-36 (1989)).  Although plaintiff never gave defendant a written or oral license, the court held that plaintiff's conduct created an implied license to use the footage in the film.  <u>Id.</u>  The court framed the implied license issue as "a creature of law, much like any other implied-in-fact contract."  <u>Id.</u> at 559 n.7.  Examining the conduct between the parties, the court adopted the district court's conclusion that "every objective fact concerning the transaction supports a

---

[4]  To the extent this Court's language in <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1225-26 (C.D. Cal. 2007) suggests that it agrees with Plaintiffs' interpretation, the Court addresses this issue <i>infra</i> at p. 21.

finding that an implied license existed." Id. at 559 n.6.
Specifically:

> Effects's copyright registration certificate states that the footage is to be used in [the film], so does the letter agreement of October 29, 1984, and Effects's President James Danforth agreed at his deposition that this was his understanding. Also, Effects delivered the film negatives to Cohen, never warning him that cutting the negatives into the film would constitute copyright infringement.  While delivery of a copy 'does not *of itself* convey any rights in the copyrighted work," 17 U.S.C. § 202 (1988) (emphasis added), it is one factor that may be relied upon in determining that an implied license has been granted.

Id. (internal citation to the record omitted).

The court in Effects also analogized the plaintiff's case to Oddo v. Ries, 743 F.3d 630 (9th Cir. 1984).  In Oddo, the court found that the plaintiff author granted the defendant publisher a nonexclusive implied license to use his articles in the defendant's book where plaintiff prepared a manuscript of his articles for the publisher, handed it over to the publisher, and intended the manuscript to be published.  Oddo, 743 F.2d at 632, 634.  The Effects court reasoned: "*Like the plaintiff in Oddo, Effects created a work at defendant's request and handed it over, intending that the defendant copy and distribute it.*  To hold that Effects did not at the same time convey a license to use the footage in [the film] would mean that plaintiff's contribution to the film was of minimal value, a conclusion that can't be squared with [defendant's $56,000 payment to Effects]." Effects Associates, 908 F.2d at 559 (emphasis added).  Accordingly, the court found that defendant had an implied license to use the footage.

Effects Associates stands for the proposition that when three requirements are met – (1) the work was created for defendant or at defendant's request; (2) the work was delivered to defendant by

11

plaintiff; and (3) plaintiff intended defendant to use the work – an implied license exists.  See  Foad Consulting Group, Inc., 270 F.3d at n.10.  However, nothing in Effects Associates establishes that these three elements are *necessary* requirements for an implied license.  The case contains no limiting language to that effect, and the holding in Effects is driven by the facts of that particular case.

In a later case, Foad Consulting Group, Inc., 270 F.3d 821 (2001), the Ninth Circuit confirmed that whether an implied license exists is a matter of contract law; as such, it is governed by state law so long as the state law does not conflict with the Copyright Act.  Id. at 827.  In Foad Consulting Group, GenCom, Inc. hired the plaintiff engineering firm, Foad Consulting, to create a "preliminary Concept Development Plan" for a 45.5 acre shopping project.  Id. at 824.  Plaintiff created the Plan and submitted it to GenCom, which then submitted it to the city.  Id.  Plaintiff then agreed to create "final engineering drawings, including a revised plot plan," for the project, which were also delivered to GenCom and then submitted to the city.  Id.  After obtaining the city's approval, GenCom's successor hired a developer to build the project, who in turn hired defendant MGA to perform engineering services.  Id.  MGA obtained copies of the revised plot plan that plaintiff had created and copied much of it in preparing final site plans for the project.  Id.  Plaintiff thereafter filed suit against MGA, GenCom's successor, and the developer, claiming that the defendants infringed upon his copyrights in the revised plot plan by copying and modifying it, by publishing the resulting final site plans and submitting them to the city, and by using the revised plot plan without his permission to build the project.  Id. at 825.

The Ninth Circuit affirmed the district court's grant of summary judgment to defendants on the ground that plaintiff, through his words and conduct, granted defendants an implied license to use the revised plot plan when building the final project.  _Id._ at 824.  The court held that "[a] nonexclusive copyright license may be granted orally or by implication." _Id._  Further, "whether a copyright holder has properly granted another a nonexclusive license by implication is a matter of state contract law . . . ." _Id._ at 827; see also Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 752 n.2 (11th Cir. 1997) ("As a general rule, state law governs the interpretation of copyright contracts, unless a particular state rule of construction would so alter rights granted by the copyright statutes as to invade the scope of copyright law . . . .").  Applying basic California contract principles to the facts at hand, the Ninth Circuit found that the parties' had not intended for GenCom to seek Foad's permission before using the plans to build the project.  _Id._ at 827-28.  Nothing in the parties' written agreement provided as much, nor did the written agreement forbid others from modifying the plans Foad submitted to Gencom.  _Id._ at 828, 830.  Thus, given the parties' agreement, plaintiff had granted GenCom an implied license to reproduce and adapt the revised site plan for the purpose of developing the project.  _Id._

Although the facts in Foad Consulting are analogous in many ways to Effects Associates, the Ninth Circuit did not conclude that the three-factors shared by both cases – creation of the work for defendants, delivery to defendants, and plaintiff's intent that defendants use the work – were necessary to the implied license defense.  _Id._  Instead, Foad noted that Effects Associates provides _one_

*instance* in which the facts are *sufficient* to support the defense: "Effects Associates stands for the principle that a seller grants a buyer an implied license to use a product for the purpose for which the seller sold it to the buyer." Id. at 827 n.10.  But as Judge Kozinski, the author of Effects Associates, explained in his concurring opinion, whether an implied license exists depends on "whether the totality of the parties' conduct indicates an intent to grant such permission [to use the work]." Id. at 837 (quoting 3 NIMMER ON COPYRIGHT § 10.03 [A][7] at 10-42 (2000)).   In sum, "[b]ecause the implied license is derived from the relationship of the parties . . . it is entirely appropriate to look *at any words or conduct* that bear on whether a copyright license should be implied." Id. at 834 (emphasis added).

Several courts (including courts within the Ninth Circuit) have found that an implied license exists even where the three-factor test proposed by Plaintiff is not met.  For example, in Morrill v. Smashing Pumpkins, 157 F. Supp. 2d 1120 (C.D. Cal. 2001), plaintiff Jonathan Morrill and his self-titled production company created an original music video/documentary in 1986 which featured defendant Billy Corgan singing with his then-existing band, the Marked. Id. at 1122.  The video was called View Marked. Id.  The court found that Corgan was a joint author of the video documentary, giving him the right to use or license any portion of the joint work. Id.  Eight years later, in 1994, Corgan was singing in a new band, Smashing Pumpkins, which was very successful. Id. at 1121.  Unbeknownst to Morrill, Corgan, the Smashing Pumpkins, and Virgin Records America released a video entitled "Vieuphoria," which contained short clips of images taken from View Marked. Id.  Morrill filed suit against Virgin Records America (among

1  others) alleging copyright infringement of his rights in the View

2  Marked video.  Id.

3       The court rejected plaintiff's infringement claim, finding that

4  Virgin Records America had an implied license to use images from View

5  Marked.  Id. at 1126.  The court held:

6           Corgan's position as a joint author of View Marked gives him
            power to grant a non-exclusive license for the use of this
7           work.  See Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558-
            59 (9th Cir. 1990).  Consistent with this right, Corgan
8           granted Defendant Virgin Records America a non-exclusive
            license to distribute Vieuphoria, which contained scenes from
9           View Marked.  A non-exclusive license to use a joint work
            need not be explicit.  See id.  By conveying a video that
10          used material from his joint work, Corgan impliedly granted a
            non-exclusive license to Virgin to distribute this material.

11

12  Id. at 1126-27.  In short, an implied license to use the View Marked

13  images was inferred from Corgan's conduct.

14       Plaintiffs' proposed implied license test cannot be squared with

15  the ruling in Morrill.  Certainly, Corgan and Morrill did not create

16  the View Marked video at the request of, or on behalf of, Virgin

17  Records America.  Indeed, View Marked was created eight years prior to

18  any dealings with Virgin Records America.  Yet the court found that the

19  parties' conduct – i.e., Corgan granting Virgin Records America a

20  license to distribute Vieuphoria – gave rise to an implied license to

21  Virgin Records America to use portions of View Marked.

22       Similarly, the court upheld the implied license defense in Keane

23  Dealer Services, Inc. v. Harts, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).

24  There, plaintiff Kevin Keane and defendant Harts developed a software

25  program while working at Shearson Lehman Brothers ("Lehman").  Id. at

26  945-46.  The software program was called SLBX and consisted of an

27  automated trading system that traded a proprietary account of Lehman's

28

against incoming retail order flow.  _Id._ at 946.  The important detail of the program was that it was only valuable so long as a retail order flow existed.  _Id._

Keane had no proprietary rights in SLBX upon its creation; all such rights belonged to Lehman pursuant to an agreement between the parties.  _Id._  In 1993, defendant Smith Barney entered into an Asset Purchase Agreement with Lehman to purchase all of Lehman's retail branches and retail order flow.  _Id._  The agreement included the "OMS system," which processed Lehman's retail order flow and fed the relevant data regarding retail orders to SLBX.  _Id._  After the sale, employees from Smith Barney called Lehman's counsel and asked him about SLBX, which he readily answered.  _Id._  It was undisputed that as of September 1993, Lehman's counsel knew Smith Barney was using the SLBX system and decided not to object.  _Id._

In mid-1995, Keane purchased all the intellectual property rights to the SLBX program from Lehman.  _Id._  Thereafter, Keane brought a copyright infringement suit against Smith Barney for its use of the SLBX program.  _Id._  Smith Barney countered that Lehman had granted it an implied license to use SLBX.  _Id._

The court granted summary judgment in Smith Barney's favor on the implied license defense.  The court held: "a nonexclusive license . . . may even be implied from conduct. . . . In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing."  _Id._ at 947.  The court found that Lehman's undisputed knowledge of Smith Barney's use of the software coupled with Lehman's silence and acquiescence in the face of such knowledge constituted an implied

license for Smith Barney to use SLBX.  Id.  Thus, as in Morrill, the Keane court found an implied license based on Lehman's conduct, without any showing that Lehman (or Keane) created the SLBX program at Smith Barney's request.

More recently, in ExperExchange, Inc. v. Doculex, Inc., No. C-08-03875 JCS, 2009 WL 3837275 (N.D. Cal., Nov. 16, 2009), the court found an implied license existed based on the fact that plaintiff knew that defendant was using its software for purposes not covered by the parties' agreement and failed to object to such use.  In ExperExchange, plaintiff was a technology company that created and licensed its "optical character recognition (OCR) software-entitled Recognition Toolkit Software ("RTK")" to manufacturers and software developers in exchange for royalty fees.  Id. at *1.  Defendant Doculex, Inc. was a small software company that designed and sold document management software products to businesses.  Id.  In May 1999, defendant Doculex entered into a License Agreement with ExperExchange which permitted Doculex to use the RTK software in connection with a product manufactured by Doculex called the "PDF.Capture" product.  Id. at *2. The License Agreement did not authorize Doculex to use the RTK software in connection with any other products sold by Doculex.  Id.

Within the first month after the Agreement was signed, Doculex began incorporating the RTK software into multiple products, not just the PDF.Capture product, and paying royalty payments to ExperExchange. Id.  The royalty reports provided to ExperExchange clearly indicated that Doculex was selling multiple products that incorporated the RTK software.  Id.  Further, ExperExchange received numerous emails regarding Doculex's use of the RTK software in products other than the

PDF.Capture product.  <u>Id.</u>  From 1999 to 2007, ExperExchange continued
to accept royalty payments from Doculex and never once informed Doculex
that its broad use of the RTK software exceeded the scope of the
License Agreement.  <u>Id.</u> at *3.  In early 2008, ExperExchange attempted
to renegotiate the License Agreement.  <u>Id.</u> at *4.  When negotiations
fell through, ExperExchange wrote Ducolex a letter stating that it knew
Ducolex had integrated the RTK software into about 10 software products
not covered by the original License Agreement, that such use breached
the contract, and that ExperExchange would pursue civil and criminal
actions against Doculex.  <u>Id.</u>  In August 2008, ExperExchange filed suit
against Doculex for copyright infringement.

The court granted Doculex summary judgment on the copyright
infringement claim, finding that plaintiff had granted Doculex an
implied license to use the RTK software with other products.  <u>Id.</u> at
*23.  The court reasoned:

> The existence of a license creates an affirmative defense to
> a claim of copyright infringement." <u>Worldwide Church of God
> v. Philadelphia Church of God, Inc.</u>, 227 F.3d 1110, 1114 (9th
> Cir.2000).  A nonexclusive license may be granted expressly
> or impliedly through conduct.  <u>Effects Associates, Inc. v.
> Cohen</u>, 908 F.2d 555, 558 (9th Cir.1990) (citing 3 MELVILLE B.
> NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.03[A] (1989). "An
> implied license can be found where the copyright holder
> engages in conduct 'from which [the] other [party] may
> properly infer that the owner consents to his use.'" <u>Field
> v. Google Inc.</u>, 412 F.Supp.2d 1106, 1116 (D.Nev., 2006)
> (citing <u>De Forest Radio Tel. & Tel. Co. v. United States</u>, 273
> U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927)). "Consent to use
> the copyrighted work need not be manifested verbally and may
> be inferred based on silence where the copyright holder knows
> of the use and encourages it." <u>Id.</u> (citing <u>Keane Dealer
> Servs., Inc. v. Harts</u>, 968 F.Supp. 944, 947 (S.D.N.Y.1997)
> ("consent given in the form of mere permission or lack of
> objection is also equivalent to a nonexclusive license")).

<u>Id.</u>  The undisputed facts demonstrated that from the inception of the
License Agreement, Doculex paid royalty payments to ExperExchange for

the use of RTK software in numerous products; that ExperExchange accepted such payments and never notified Doculex that its use of the software in those products exceeded the License Agreement; that ExperExchange renewed the License Agreement for years; and that ExperExchange encouraged Doculex to use its software in as many products as possible and knew that they were in fact doing so. Id. at *24. Although Doculex's use of the software in products other than PDF.Capture was not explicitly covered by the License Agreement, ExperExchange's conduct over the course of 8 years granted Doculex an implied license to use the RTK software in other products. Id. Accordingly, the Court held that, as to the products other than PDF.Capture in which ExperExchange knew Doculex had incorporated the RTK software and to which ExperExchange did not object, Doculex had an implied license. Id.

Like Morrill and Keane, the facts in ExperExchange fail to meet the "creation" prong of the three-part test Plaintiffs propose. There is no evidence that ExperExchange created the RTK software at Doculex's request; rather, the software was a product licensed to numerous companies other than Doculex. Further, ExperExchange did not deliver the RTK software for the express purpose of having it incorporated in any products other than Doculex's PDF.Capture product. This purpose was inferred, however, from ExperExchange's knowledge and acquiescence in such use. Thus, the totality of the circumstances gave rise to an implied license. Id.; see also Pamfilof v. Giant Records, Inc., 794 F. Supp. 933, 934 (N.D. Cal. 1992) (defendant had an implied license to use plaintiff's musical compositions by virtue of an agreement with plaintiff that permitted defendant to use the related sound recordings;

such an agreement "would be worthless to [defendants] if they were prevented from using the sound recordings because they did not have permission to use the underlying musical compositions."); UMG Recordings Inc. v. Disco Azteca Distributors, Inc., 446 F. Supp. 2d 1164, 1177-78 (E.D. Cal. 2006) (defendant received and accepted royalty payments for counterdefendants' use of its sound recordings; court held that "such acceptance of counterdefendants' payments gives rise to an implied license as a matter of law"); Field v. Google, Inc., 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (defendant author who published his work on his personal website granted Google.com an implied license to publish archived screenshots of the website and to link users to the website where defendant knew how to prohibit such use through meta-tag instructions, knew that if he did not employ such meta-tags Google would use the copyrighted works on the website in the manner described, and instead made a conscious decision to permit such use.)

All of the cases cited above were decided after Effects Associates, and most of them cite directly to Effects Associates in support of the finding that an implied license was granted. None of the cases, however, interpret Effects Associates as limiting the implied license defense to the circumstances of that case, nor do they require that the work be created specifically at the request of the defendants. In light of the authority outlined above, the Court concludes that the implied license defense is not as limited as Plaintiffs suggest. The fact that Plaintiffs in the present case did not create the sound recordings at Defendant's request or for Defendant's benefit does not defeat the implied license defense as a matter of law.

Finally, to the extent this Court's opinion in Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197 (C.D. Cal. 2007) suggests a contrary ruling, the Court notes that the implied license defense in Grokster was so wholly unfounded that it warranted little discussion and would have failed under any test.  In Grokster, the defendant argued that because plaintiffs had allowed *other* peer-to-peer networks to distribute its copyrights, plaintiffs implicitly granted defendant a license to do so as well.  Id. at 1226.  In rejecting this argument, the Court recognized that an implied license defense can be created where plaintiff's permission is "inferred based on silence where the copyright holder knows of the use and encourages it," id. at 1225, but found that there was "no evidentiary basis" that would allow such a conclusion in that case.  Id.  Plaintiffs' conduct vis-à-vis others did not grant an implied license to the "rest of the world" to distribute the copyrighted material, and there was no evidence that plaintiffs knew and encouraged defendants to do so.  See id.

In addition to the holding above, this Court in Grokster quoted the Ninth Circuit's opinion in A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001), for the proposition that "courts have found implied licenses only in 'narrow' circumstances where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'"  Grokster, 518 F. Supp. 2d at 1226 (citing Napster, Inc., 239 F.3d at 1026).  This statement, however, on its face does not preclude a finding of an implied license in other circumstances; it simply states that prior cases have all fit

that mold.[5]  Nonetheless, the Court recognizes that its Grokster opinion

suggests that this statement from Napster gives rise to mandatory

requirements for an implied license defense.  However, having read and

reviewed the authorities above, some of which were decided after this

Court's Grokster ruling, the Court is convinced that such an

interpretation is too restrictive and does not accurately state Ninth

Circuit law.  As in Grokster, the implied license defense in Napster

was patently untenable under the totality of the circumstances –

indeed, the plaintiff had expressly objected to the availability of its

copyrighted material on defendant's website - and the court only

devoted a single-paragraph discussion to the issue.  Napster, 239 F.3d

at 1026.  The Ninth Circuit's subsequent decision in Foad confirmed

that, as with any other implied-in-fact contract, the existence of an

implied license depends on whether the totality of the parties' words

and conduct indicates that the plaintiff permits the defendant to use

its works in a certain manner.

Here, Defendants have alleged that Plaintiffs knew Defendants were

using their sound recordings on the Show (FAA ¶ 54), that Plaintiffs

attended the Show several times throughout the years (id. at 2), that

Plaintiffs sent sound recordings to Defendants and encouraged them to

use the recordings on the Show (id. ¶¶ 2, 54), that Plaintiffs reaped

benefits in the form of increased sales from the Show's use of their

music (id. ¶¶ 51-53), and that Plaintiffs never objected until 2009 to

---

[5] Indeed, most (but not all) implied license cases meet these requirements.  See e.g., Herbert v. U.S., 36 Fed. Cl. 299, 310-11 (Fed. Cl. 1996); I.A.E. Incorporated v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996); Asset Marketing Systems, Inc. v. Gagnon, 542 F.3d 748 (9th Cir. 2008); Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997); Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999).

the Show's use of their music (id. ¶¶ 60, 62).  Although an implied
license defense may not ultimately prevail, these allegations are
sufficient to state a defense that is plausible on its face.

### b.  Specificity of the Implied License Defense

Plaintiffs' second argument – that the implied license defense
lacks the requisite specificity – can be easily rejected.  Plaintiffs
argue that Defendants' First Amended Answer only provides some *examples*
of the conduct which Plaintiffs contend gives rise to an implied
license, but does not identify each individual conversation in which
Plaintiffs encouraged Defendants to use their recording and fails to
identify each individual CD that was sent to Defendants by Plaintiffs.
Plaintiffs contend that allegations regarding *some* instances in which
Plaintiffs encouraged the use of certain sound recordings on the Show
cannot, as a matter of law, give rise to a blanket license to use *all*
of Plaintiffs' sound recordings.

The scope of the implied license(s) and how far it extends
(assuming an implied license exists) is a question of fact that depends
upon the parties' conversations, Plaintiffs' conduct in allegedly
encouraging the use of the recordings, and Plaintiffs' alleged
knowledge of and reaction to Defendants' use.  It cannot be resolved on
the pleadings.  While Defendants ultimately may be correct that such
conduct can, at most, support only a limited implied license to use
some works – indeed, a blanket implied license would be extraordinarily
difficult to prove – the defense cannot be stricken simply because it
is a partial defense.  CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5C FEDERAL
PRACTICE AND PROCEDURE § 1381, at 415 (3d ed. 2004); Shenandoah Life Ins.
Co. v. Hawes, 37 F.R.D. 526, 529 (E.D. N.C. 1965) (a partial defense

will not be stricken as an insufficient defense); <u>Shepherd v. Popular Publications</u>, 10 F.R.D. 389 (S.D.N.Y. 1950)(same).  Here, each of the 491 separate sound recordings at issue forms the basis for a separate infringement.  To the extent Defendants can limit their liability by establishing an implied license with regard to some (but not all) of the recordings, the defense is nonetheless valid.

Finally, the Court rejects Plaintiffs' argument that Defendants should be required to allege in their Answer every conversation regarding every work and every instance in which Plaintiffs attended the Show or sent a CD to Defendants.  These are issues of fact that need to be developed through discovery and are not appropriate for a motion to strike.[6]  The Court's determination on a motion to strike is limited to whether the pleadings state a plausible defense and whether issues of fact exist, that if resolved in Defendants' favor, would support the defense.  For the reasons stated above, Defendants' allegations regarding the implied license defense are sufficient.

Plaintiffs' Motion to Strike the First Affirmative Defense is DENIED.

### 2.  Consent

Defendants incorporate each of the allegations in support of their implied license defense to assert the Fourth Affirmative Defense of consent.  As Defendants implicitly concede, however, the defense of

---

[6] Notably, Plaintiffs' Complaint alleges generally that "from the Show's inception, sound recordings owned by the Plaintiffs have been incorporated into the Show without Plaintiffs' permission." (First Amended Complaint ¶ 40.)  There are 491 recordings at issue.  (FAA ¶ 29, Exhs. A and B.)  The Court has not required (nor would it) that Plaintiffs allege, with respect to every sound recording, when it was used on the Show, under what circumstances, and how Plaintiffs learned that specific recording was used.  These factual matters are properly the subject of discovery and a resolution on the merits.

consent in the copyright context is the direct equivalent of the implied license defense.  (See Opp'n at 12); IAE, Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996) ("consent given in the form of mere permission . . . is *also equivalent to a nonexclusive license*.").  Thus, the consent defense is redundant and unnecessary.  Accordingly, the Court GRANTS Plaintiffs' Motion to Strike the Fourth Affirmative Defense WITHOUT LEAVE TO AMEND.

### 3.   Copyright Misuse

Defendants' Fifth Affirmative Defense states in its entirety: "Defendants reallege and incorporate the facts alleged in support of the first, second, and third affirmative defenses, set forth at paragraphs 50 through 62 above.  As a result of these facts, UMG's claims are barred by its own copyright misuse.  As such, UMG is barred from enforcing its copyrights."  (FAA ¶ 64.)  In their Opposition to the Motion to Strike, Defendants clarify that the misuse defense is based on the allegation that "[UMG] did not demand that the Show pay for licenses or stop using its recorded music until it had agreed with other record labels to jointly pursue payment for master-use licenses from the Show."  (Id. ¶ 60.)  Defendants argue that Plaintiffs violated the antitrust laws "by organizing a conspiracy of the four major record label conglomerates . . . to leverage excessive licenses from Warner Bros. under threat of a boycott of the Show by the major labels." (Opp'n at 13.)

Plaintiffs contend that the copyright misuse defense is insufficiently pled because none of the allegations in the First Amended Answer put Plaintiffs on notice of Defendants' refusal-to-deal or group-boycott theory.   The Court agrees.   There are no facts

alleged in the First Amended Answer indicating that any of the "four major record labels" refused to license their works to Defendants at any time (or that Defendants even sought such licenses), nor are their any allegations that Defendants threatened to boycott Defendants. Additionally, Defendants have not alleged any facts indicating that the record companies colluded to fix prices for such licenses at anti-competitive levels or took any other action to "leverage [their] copyright[s] to restrain creative activity" or "to control areas outside of their grant of monopoly [under the Copyright Act]." Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 997 (C.D. Cal. 2006); Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 428 (D. N.J. 2005).

Instead, the only "agreement" among the record companies that is even plausibly alleged in the First Amended Answer is that they decided to jointly demand that the Show pay for licenses for the recordings it was using. However, "[a] plaintiff's 'enforcement of its copyrights does not constitute copyright misuse." Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 454 F. Supp. 2d 966, 998 (C.D. Cal. 2006) (quoting Advanced Computer Servs. of Michigan, Inc. v. MAI Systems Corp., 845 F. Supp. 356, 370 (E.D. Va. 1994)). Moreover, "coordinated efforts to enforce copyrights against a common infringer," without more, do not give rise to an antitrust violation or a misuse defense. Primetime 24 Joint Venture v. Nat'l Broadcasting Co., 219 F.3d 92, 99, 103 (2d Cir. 2000); Arista Records, Inc., 356 F. Supp. 2d at 428 ("the fact of enforcing a valid copyright, without more, simply cannot constitute copyright misuse."); Micro-Star v. Formgen, Inc., 154 F.3d 1107, 1114 n.8 (9th Cir. 1998) (rejecting a claim that plaintiff

26

engaged in copyright misuse by enforcing its rights in a computer

game.).    In sum, Defendants have done no more than allege, at most, a

concerted effort of the record companies to enforce their rights. For

this reason, the First Amended Answer fails to state a misuse defense.

Plaintiffs' Motion to Strike the Fifth Affirmative Defense is
GRANTED WITH LEAVE TO AMEND.  Defendants are granted 20 days from the
date of this order leave to amend.

Furthermore, if Defendants decide to amend the FAA so as to assert
a copyright misuse claim, and assuming the amended allegations are
sufficient, the parties are on notice that the Court almost certainly
would bifurcate that defense.  The defense of copyright misuse raises a
whole host of issues regarding potentially anticompetitive conduct and
alleged collusion between Plaintiffs and parties who are no longer
parties to the present action.  As such, it could give rise to
voluminous discovery on issues unrelated to the remainder of the action
and unnecessarily confuse the issues for the jury.  For these reasons,
judicial economy would support bifurcation of a copyright misuse
defense.

### 4.    Estoppel

Defendants' Seventh Affirmative Defense incorporates the factual
allegations of the implied license defense (among others) to assert an
estoppel defense.  Estoppel applies where the plaintiff "has aided the
defendant in infringing or otherwise induced it to infringe or has
committed covert acts such as holding out . . . by silence or
inaction." Field v. Google, Inc., 412 F. Supp. 2d 1106, 1116 (D. Nev.
2006) (quoting Quinn v. City of Detroit, 23 F. Supp. 2d 741, 753 (E.D.
Mich. 1998); NIMMER ON COPYRIGHT § 13.07 (revised ed. 2009).  To assert a

valid estoppel defense, Defendants must allege: (1) that Plaintiffs knew of Defendants allegedly infringing conduct; (2) that Plaintiffs intended that their conduct would be acted on or acted in such a way that Defendants had a right to believe it was intended; (3) that Defendants were ignorant of the true facts (i.e., that the use was not permitted); and (4) that Defendants relied to their detriment on Plaintiffs' conduct.  See id. at 1116; Hampton v. Paramount Pictures Corp., 279 F.2d 100 (9th Cir. 1960).

Defendants' factual allegations satisfy each of the four elements of the estoppel defense.  First, as to Plaintiffs' knowledge, Defendants allege that Plaintiffs attended tapings of the Show during which Plaintiffs' sound recordings were played, and arranged for its artists to appear on the Show with the understanding that the artists' recorded music would be played during the Show.  (FAA at 2, ¶¶ 51, 54, 57.)  Second, Defendants sufficiently allege that Plaintiffs acted in such a way so as to lead Defendants to reasonably believe they intended Defendants to play their sound recordings.  Specifically, Defendants allege that Plaintiffs sent Defendants copies of CDs "for the purpose of allowing the Show to play these recordings," (FAA at 2), told the Show's producers that the addition of a "dance-over" segment in which Plaintiffs' music was played increased CD sales (id. ¶ 51), and called the Show's staff to urge them to use Plaintiffs' sound recordings (id. ¶ 54).  Third, Defendants' ignorance – i.e., that Defendants did not know that Plaintiffs required an express license – can reasonably be inferred from the allegation that UMG never objected to the Show's use of its music for nearly 6 years (id. at 2), and that, had Plaintiffs objected, Defendants would have ceased using the music without a

license (<u>id.</u> ¶ 61).  Finally, Defendants' reliance is adequately pled because Defendants allege that had they known Plaintiffs objected to their use of the recordings, Defendants would have stopped using the recordings or obtained a license, thereby limiting or eliminating their liability.  (<u>Id.</u> ¶ 61.)

Plaintiffs' arguments against the estoppel defense lack merit. First, Plaintiffs argue that the FAA fails to allege an "overt, affirmative misrepresentation" by Plaintiffs indicating their intent that Defendants use the recordings.  (Mot. at 12.)  As stated above, however, no such overt misrepresentation need be alleged.  A copyright holders' silence or inaction in the face of an infringement can give rise to an estoppel defense, particularly where such inaction is prolonged.  <u>See</u> <u>Field</u>, 412 F. Supp. 2d at 1117 (granting summary judgment for defendant on an estoppel defense where plaintiff "remained silent regarding his unstated desire" that plaintiff not use his work in a particular way, all the while knowing that defendant would interpret the silence as permission); <u>Carson v. Dynegy, Inc.</u>, 344 F.3d 446, (5th Cir. 2003) ("It is accepted that estoppel may be accomplished by a plaintiff's silence or inaction."); <u>Hampton</u>, 279 F.2d at 104 ("A holding out may be accomplished by silence and inaction.")

Plaintiffs' second argument is that Defendants cannot reasonably contend that they believed Plaintiffs' conduct constituted permission to use the works without a license.  (Mot. at 12-13.)  In making this argument, however, Plaintiffs misunderstand the procedural posture of their motion.  Plaintiffs' argument relies almost entirely on factual matters that go far beyond the scope of the pleadings – for example, Plaintiffs assert that "it is well-known" that Plaintiffs' CDs contain

explicit copyright notices, that Defendants never inquired of Plaintiffs whether a license was needed, and that had Defendants so inquired, Plaintiffs would have told them they needed a license.[7]  (<u>Id.</u>) None of these purported facts are alleged in the Answer, nor are they the proper subject of judicial notice.  The Court's review on a motion to strike is limited to the allegations in the pleadings, assuming such allegations are true and making all inferences in Defendants' favor. Under this standard, the estoppel defense is clearly sufficient.[8]

Plaintiffs Motion to Strike the Seventh Affirmative Defense is DENIED.

### 5.  Waiver[9]

Defendants' Eighth Affirmative Defense is waiver.  In support of the defense, Defendants allege that "in order to encourage the Show to use its music, UMG provided the Show with the music that was played on the Show and actively encouraged the Show to use that music, knowing all along that the Show was not paying for formal master use licenses." (FAA ¶ 54.)

---

[7]  If Plaintiffs believe such facts are undisputed and would conclusively defeat the estoppel defense as a matter of law, they may assert such an argument by way of a summary judgment motion.

[8] Plaintiffs also argue for the first time in their reply brief that the FAA does not allege that Plaintiffs knew the Defendants' use was infringing – that is, Defendants allege only that Plaintiffs knew they were using the recordings but not that Plaintiffs knew Defendants did not have a license to do so.  (Reply at 12-13.)  This argument is simply inaccurate.  The FAA clearly alleges that "UMG expected the Show to use its recorded music in these and other instances, with full knowledge that it had not charged the Show for master-use licenses."  (FAA at 2, and ¶ 54.)  For purposes of this motion, the Court must accept this allegation as true.

[9] Waiver and estoppel are related but distinct concepts.  Waiver is "an intentional relinquishment or abandonment of a known right or privilege."  <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938); <u>United States v. King Features Entertainment, Inc.</u>, 843 F.2d 394, 399 (9th Cir. 1988).  Waiver requires an intent to relinquish the right, whereas estoppel does not; estoppel requires detrimental reliance, whereas waiver does not.

Plaintiffs argue that the defense is insufficient because none of the allegations show an express waiver of Plaintiffs' rights, and the mere failure to act upon knowledge of Defendants' infringement is not sufficient.  (Mot. at 14) (citing ABC, Inc. v. PrimeTime 24, Joint Venture, 17 F. Supp. 2d 478, 485 (M.D.N.C. 1998), *vacated in part on other grounds*, 184 F.3d 348 (4th Cir. 1999).[10]

"Strictly speaking, 'waiver' itself does not serve as a defense to copyright infringement.  Instead, *abandonment* of the copyright . . . constitutes an effective defense in an infringement action."  NIMMER ON COPYRIGHT § 13.06 (revised ed. 2009).  Waiver or abandonment of copyright protection "occurs only if there is an intent by the copyright proprietor to surrender rights in his work."  Wyatt Technology Corp. v. Malvern Instruments, Inc., No. CV 07-08298 DDP (MANx), 2009 WL 2365647, at *11 (C.D. Cal. 2009) (citing A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026 (9th Cir. 2001)).  Abandonment of one's copyright must be manifested by "some overt act indicative of a purpose to surrender the rights and allow the public to copy."  Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960); Micro Star v. Formgen, Inc., 154 F.3d 1107, 1114 (9th Cir. 1998).[11]

---

[10] Both parties rely on ABC, Inc., 17 F. Supp. 2d 478, when asserting arguments on the waiver defense.  While ABC, Inc. contains an extensive analysis of the waiver argument, it is important to note that the issue in ABC, Inc. was whether plaintiffs' conduct constituted a waiver of certain statutory rights under the Satellite Home Viewer Act related to plaintiffs' copyrighted network programming, rather than a waiver of the copyrights themselves.  17 F. Supp. 2d at 484-85.

[11] For example, in Hadady Corp. v. Dean Witter Reynolds, Inc., 739 F. Supp. 1392, 1399 (C.D. Cal. 1990), the court found that plaintiff abandoned his copyright in a weekly newspaper where the newspaper included a notice that stated that the copyright would only last for two days.  Similarly, in Wyatt Technology Corp. v. Malvern Instruments, Inc., 2009 WL 2365647, the plaintiff abandoned its copyright in software called "PSI Books" where the front page of PSI Books contained the statement: "Currently, there are no restrictions on this material.  You may install it on as many PC systems as you like, and you may distribute it freely to your colleagues."  Id. at *12; see also Pacific & Southern Co. v. Duncan, 572 F. Supp. 1186, 1196 (N.D. Ga. 1983), *aff'd*, 744 F.2d 1490 (11th Cir. 1984) (finding an intent to abandon copyright where plaintiff destroyed its only copy of the work).

Plaintiffs are correct that a copyright owner's failure to act on an infringement generally is insufficient to establish waiver or abandonment. <u>Hampton</u>, 279 F.2d at 104; <u>ABC, Inc.</u>, 17 F. Supp. 2d at 485; <u>Paramount Pictures Corp. v. Carol Publ'g Group</u>, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998); <u>Dodd, Mead & Co. v. Lilienthal</u>, 514 F. Supp. 105, 109 (S.D.N.Y. 1981); <u>but see Stuff v. E.C. Publications, Inc.</u>, 342 F.2d 143, 144 (2d Cir. 1965) (plaintiff abandoned copyright and dedicated the work to the public where "a great volume" of copies of the work circulated without any copyright notices and the owner authorized or acquiesced in the circulation). Further, abandonment of rights in a certain copyrighted work does not, without more, act as a blanket wavier or abandonment of rights to others. <u>ABC, Inc.</u>, 17 F. Supp. 2d at 485; <u>Micro Star</u>, 154 F.3d at 1114, (9th Cir. 1998) ("abandoning some rights [under copyright law] is not the same as abandoning all rights.") Although waiver or abandonment need not be express, implied waivers are not favored in the law and require, "clear, decisive and unequivocal conduct indicating an intent to waive the legal right involved." <u>ABC, Inc.</u>, 17 F. Supp. at 485 (citing Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, Evidence § 5033 (1977)).

Although this is somewhat of a close call, the Court finds that Defendants' FAA is sufficient to state a plausible waiver or abandonment defense. Defendants have alleged more than Plaintiffs' mere inaction in the face of alleged infringement; Defendants have alleged that Plaintiffs' employees and representatives sent Defendants

---

In each of these cases, the copyright holder's conduct indicated that it had abandoned any copyright protection.

copies of the copyrighted sound recordings and affirmatively urged Defendants to play the recordings on the Show, all the while knowing that Defendants did not have licenses.   Accepting these allegations as true, this may be sufficient to demonstrate clear, decisive and overt conduct indicating a waiver or abandonment of Plaintiffs' rights.

Accordingly, Plaintiffs' Motion to Strike the Eighth Affirmative Defense is DENIED.

### 6.   Unclean Hands

Defendants' Ninth Affirmative Defense of unclean hands is based on the allegations that Plaintiffs acted inequitably by actively promoting their music and sound recordings through the Show, by urging the Show to play their sound recordings and sending such recordings to Defendants, by failing to ask for licenses for the recordings for over five years, by realizing benefits in terms of increased publicity and CD sales from the Show's use of Plaintiffs' music, and then demanding that the Show finally acquire a license after Defendants had allegedly infringed upon their copyrights for years.  (FAA at 3, ¶¶ 51-54, 57, 59-62).

Plaintiffs argue that the unclean hands defense fails because it provides insufficient notice to Plaintiffs of the claim and because the defense is equitable in nature and only applies to equitable claims. These arguments lack merit.

First, the defense is properly pled.  The unclean hands defense is an equitable defense available where the plaintiff engages in wrongful conduct that "in some measure affect[s] the equitable relations between the parties in respect to [the claims] brought before the court for

adjudication." <u>Dream Games of Arizona, Inc. v. P.C. Onsite</u>, 561 F.3d 983, 990 (9th Cir. 2009) (quoting <u>Mitchell Bros. Film Group v. Cinema Adult Theater</u>, 604 F.2d 852, 863 (5th Cir. 1979)).   Additionally, the defendant must demonstrate that the plaintiff's alleged wrongful conduct personally injured defendant.   <u>Id.</u>; <u>see</u> <u>Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.</u>, 518 F. Supp. 2d 1197, 1223 (C.D. Cal. 2007).   Here, Defendants have provided adequate notice of the basis of their unclean hand defense.[12]   In essence, Defendants allege that Plaintiffs inequitably laid a trap for Defendants, or at least allowed Defendants to fall into one, by encouraging the unlicensed use of Plaintiffs' works, reaping the benefits of such use, and then suing years later for damages due to the alleged infringement.   The alleged misconduct relates directly to the relations between the parties and the infringement claims at issue in this lawsuit.   Whether the unclean hands defense will ultimately have any merit given the factual development of this case cannot be resolved on a motion to strike.

Second, the defense need not be stricken simply because it is equitable in nature.   The unclean hands defense "has been held available in a copyright infringement action regardless of whether the action is one at law or in equity."   Nimmer on Copyright § 13.09[B] (revised ed. 2009) (citing cases; <u>see</u> <u>Societe Civile Succession Richard Guino v. Beseder, Inc.</u>, No. CV 03-1310-PHX-MMH, 2006 WL

---

[12]   The cases cited by Plaintiffs do not support their argument.   In <u>T-Mobile USA, Inc. v. Wireless Exclusive USA, LLC</u>, No. 3:08-CV-0340-G, 2008 WL 2600016, *3 (N.D. Tex., July 1, 2008), the court struck defendants' unclean hands defense as insufficiently pled where defendants' answer alleged only that "plaintiff's claims are barred by the doctrine of unclean hands," without alleging any facts in support of that conclusion.   Similarly, in <u>Reis Robotics USA, Inc. v. Concept Industs, Inc.</u>, 462 F. Supp. 2d 897, 907 (N.D. Ill. 2006), the court struck the affirmative defense were the answer stated only "[plaintiff's] claims are barred or limited by laches, waiver, estoppel, unclean hands, or similar legal or equitable doctrines."   <u>Id.</u>   In contrast to both <u>T-Mobile</u> and <u>Reis Robotics</u>, the Defendants here have alleged specific facts in support of the unclean hands defense.

2917349, at *5 (D. Ariz., Oct. 6, 2006) ("The defense of unclean hands applies in copyright infringement cases to prevent a plaintiff from obtaining relief both in law and in equity.") (citing Supermarket of Homes v. San Fernando Valley Bd., 786 F.2d 1400, 1408 (9th Cir. 1986)); Grokster, 518 F. Supp. 2d at 1223-24 (applying the unclean hands defense to plaintiffs' claims of copyright infringement).  Furthermore, Plaintiffs' Second Amended Complaint not only seeks injunctive relief, restitution, and other equitable remedies, but also alleges an equitable claim under California's Unfair Competition Law, Business & Professions Code § 17200 et seq..  See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003).

For these reasons, the Court DENIES Plaintiffs' Motion to Strike the Ninth Affirmative Defense.

### 7.   Failure to Mitigate Damages

Plaintiffs' first argument against the Tenth Affirmative Defense for failure to mitigate damages is that the defense is inadequately pled and does not give Plaintiffs notice of the factual basis for the defense.  The Court disagrees.  In the FAA, Defendants incorporated by reference paragraphs 50 to 62 when alleging the failure to mitigate. (FAA ¶ 70.)  These factual allegations provide sufficient notice of the basis of the defense.  Specifically, Defendants allege that Plaintiffs knew that Defendants were using their sound recordings on the Show and failed to demand license payments for many years, and further, had Plaintiffs demanded license payments sooner, Defendants would have stopped using Plaintiffs recordings on the Show thereby reducing their liability and corresponding damages for later infringements. (See FAA ¶ 61.)   In sum, Plaintiffs' failure to demand that Defendants cease

the alleged infringement sooner led to additional alleged infringements and additional damages.  The basis of the defense is clear; indeed, Plaintiffs adequately summarized the alleged factual basis for the defense in their moving papers on this Motion to Strike.  (Mot. at 16.)

Whether the mitigation defense has any plausible validity, however, is another matter.  Defendants have not cited, and the Court has not found, any analogous cases in which the plaintiff's acquiescence to defendant's infringement or its failure to object to such infringement served as a basis to limit or reduce damages (other than cases in which a valid statute of limitations or laches defense existed).

Furthermore, as Plaintiffs correctly argue, the Copyright Act does not contain a requirement that the copyright owner provide notice to an alleged infringer as a prerequisite to filing suit or seeking damages.  See 17 U.S.C. § 504.  To the contrary, the Ninth Circuit has expressly held that "the Copyright Act does not provide for a waiver of infringing acts [occurring] within the [statute of] limitation[s] period if earlier infringements were discovered and not sued upon . . . ."  Roley v. New World Pictures, Ltd., 19 F.3d 479 (9th Cir. 1994).  Thus, the mere fact that Plaintiffs failed to sue on earlier alleged infringements would not bar their right to sue for subsequent infringements.  Id.

The Court also finds persuasive Plaintiffs' argument that imposing an implied notice requirement (under the guise of the doctrine of failure to mitigate damages) as a condition to Plaintiffs' remedies under the Copyright Act conflicts with the purposes of the Copyright Act.  In American Society of Composers, Authors, and Publishers by

Bergman v. Pataki, 930 F. Supp. 873, 879 (S.D.N.Y. 1996), the court enjoined enforcement of a New York statute requiring copyright owners to provide notice to an alleged infringer within 72 hours of the copyright owner's investigation of possible infringement.   Id.   The court found that the statute conflicted with and was preempted by the Copyright Act.   Id. at 878-79.   Specifically, the court held that the 72-hour notice requirement hinders a copyright owners' ability to detect a pattern of ongoing infringement, which is a prerequisite to obtaining injunctive relief and enhanced statutory damages for willfulness.   Id. at 879.   Furthermore, the court reasoned:

> The notice requirement also presents a conflict with the federal statute of limitations.   Statues of limitations generally serve to ensure fairness to defendants; "such statutes promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. . . . Congress established a three-year statute of limitations for infringement suits, see 17 U.S.C. § 507, and thus determined that three years is the appropriate amount of time required to ensure fairness to alleged infringers. . . .   The notice requirement is thus a limiting device which serves the same purpose as the federal statute of limitations: to ensure fairness to alleged infringers.   Under the Supremacy Clause, the state has no power to resist Congress's determination of fairness as embodied in the federal statute of limitations, and its attempt to do so conflicts with federal law.

Id. at 879.

This rationale is applicable to the mitigation defense as well. That is, reducing Plaintiffs' damages for infringements occurring within the statute of limitations period because of their failure to affirmatively stop those infringements at an earlier time is inconsistent with the statute of limitations provided for by the Copyright Act, 17 U.S.C. § 507(b).

This is not to say that Plaintiffs' alleged delay in enforcing
their rights is irrelevant; to the contrary, it may preclude liability
altogether for certain infringements if the laches or statute of
limitations defenses are successful.  However, the Court agrees with
Plaintiffs that Defendants' Tenth Affirmative defense is duplicative
and redundant of the statute of limitations defenses and the laches
defense.  Thus, even assuming the mitigation defense has some validity,
it is unnecessary and redundant.

Accordingly, Plaintiffs' Motion to Strike the Tenth Affirmative
Defense is GRANTED WITHOUT LEAVE TO AMEND.

**8.   Laches**

Defendants' Third Affirmative Defense is laches.  Laches is an
equitable time limitation that bars an action where the plaintiff's
unexcused or unreasonable delay in enforcing its rights has prejudiced
defendant.  <u>Boone v. Mechanical Specialties Co.</u>, 609 F.2d 956, 959 (9th
Cir. 1979).  To establish a laches defense, the defendant must prove
(1) an unreasonable delay by the plaintiff in enforcing its rights, and
(2) prejudice to defendant.  <u>Kling v. Hallmark Cards, Inc.</u>, 225 F.3d
1030, 1036 (9th Cir. 2000).

Defendants allege that Plaintiffs unreasonably delayed in bringing
their claims for infringement because Plaintiffs were aware that from
September 2003 to February 2009 Defendants were using their recordings
on the Show without licenses, but did not send a cease and desist
letter until February 2009.  (FAA ¶¶ 59-60.)  Further, Plaintiffs
allegedly "made repeated inquiries regarding the Show not paying for
master-use licenses but did not demand that the Show pay for licenses
or stop using its recorded music [until 2009]."  (<u>Id.</u> ¶ 60.)

Defendants allege that the delay prejudiced them because they continued

to use the recorded music without licenses, and that had Plaintiffs

diligently pursued their claims, Defendants would have stopped this

practice and avoided liability.  (Id. ¶ 61.)

Plaintiffs contend that a laches defense fails as a matter of law

in a copyright infringement action where the action is brought within

the Copyright Act's three-year statute of limitations period.[13]

Plaintiffs argue that where Congress has provided for an express statue

of limitations to govern the action, the Court cannot contract that

time period by applying the doctrine of laches to bar an otherwise

timely claim.  (Mot. at 1-3.)  Plaintiffs rely primarily on case law

from other circuits to support their argument, as well as a Ninth

Circuit case outside of the copyright context.  While the Court

recognizes that some circuits have adopted the rule put forth by

Plaintiffs, the Ninth Circuit is not one of them.  See Chirco v.

Crosswinds Communities, Inc., 474 F.3d 227, 231-34 (6th Cir. 2007)

(explaining the circuit split regarding whether laches is an available

defense to a copyright infringement action).

Plaintiffs' argument is unequivocally precluded by Kling v.

Hallmark Cards, Inc., 225 F.3d 1030 (9th Cir. 2000).  In Kling, Heywood

Kling was hired by DIC in 1983 and 1984 to write scripts for a series

of television specials featuring the characters Rainbow Brite and

Robotman.  Id. at 1031.  DIC agreed to assign to defendant Hallmark the

copyrights in all material created by or for DIC.  Id.  Kling wrote the

_____

[13]  Notably, if a claim is not brought within the Copyright Act's statute of
limitations period, the laches defense is unnecessary because the claim is already
barred by the statute of limitations.  Defendants have also alleged an affirmative
defense of statute of limitations, which Plaintiffs do not challenge in this Motion
to Strike.

scripts.  From 1984 to 1986, Hallmark registered copyrights to the television specials Kling had written.  Id. at 1033.  In 1984, Kling raised a dispute with DIC regarding card credit – Kling wanted "Developed by" credit - in episodes of Rainbow Brite and Robotman that were not written by Kling but featured the characters Kling had developed in his earlier scripts.  Id.  During the course of the dispute, DIC's counsel sent Kling a letter stating that the work performed by Kling was a work-for-hire for copyright purposes, and that DIC was the rightful owner of all results and proceeds of the work. Id.  The parties eventually resolved the credit dispute but did not come to any agreement as to copyright ownership.  Id. at 1033-34.

In 1988, Kling died.  Six years later in 1994, his widow, Mary Kling was in a Blockbuster Video store and noticed that the store was renting video cassettes of the television specials featuring the Rainbow Brite characters, including the shows for which her husband had written the scripts.  Id. at 1034.  Neither Mrs. Kling nor her husband had authorized the making or distribution of video copies of the television shows.  Id.  In August 1997, Mrs. Kling filed suit against Hallmark, DIC, and others alleging copyright co-ownership and infringement claims.  Id.  The district court granted summary judgment in favor of defendants on the ground of laches and Mrs. Kling appealed. Id.

On appeal, the Ninth Circuit addressed the issue of whether, **assuming Mary Kling owned the copyrights**, the doctrine of laches barred her from filing a claim for infringement based on infringing conduct that began in 1985 but may not have come to either of the Kling's attention prior to 1994.  Id.  In so doing, the Ninth Circuit not only

recognized laches as an available defense to a copyright infringement

action, but **expressly held** that a copyright owner's infringement claim

may fail under the laches doctrine even if the copyright owner complied

with the Copyright Act's statute of limitations.  Id. at 1039.  The

Ninth Circuit reasoned as follows:

> This is not to say that the starting point for laches will
> always be the same as the starting point for the statute of
> limitations for copyright infringement.  The statute provides
> that 'no civil action shall be maintained . . . unless it is
> commenced within three years after the claim accrued.'  17
> U.S.C. § 507(b).  Applying this statute, this court has held
> that a 'cause of action for copyright infringement accrues
> when one has knowledge of a violation or is chargeable with
> such knowledge.'  Roley, 19 F.3d at 481 (citing Wood v. Santa
> Barbara Chamber of Commerce, Inc., 507 F. Supp. 1128, 1135
> (D. Nev. 1980)).  But while a statute of limitations is
> triggered only by violations – i.e., actual infringements –
> the laches period may be triggered when a plaintiff knows or
> has reason to know about an impending infringement. . . .
> **Thus, a copyright holder would be vulnerable to the laches
> defense if he had knowledge of a planned infringement more
> than three years prior to the filing of his action, even if
> he complied with the statute of limitations by filing it less
> than three years after the infringement actually began.**

Id. at 1039 (emphasis added).  In reaching the conclusion that

knowledge of planned infringements could bar an infringement claim

under a laches defense, the court focused on the equitable nature of

the defense: "It must be obvious to everyone familiar with equitable

principles that it is inequitable for the owner of a copyright, with

full notice of an intended infringement, to stand inactive while the

proposed infringer spends large sums of money in its exploration, and

to intervene only when his speculation proved a success."  Id. (quoting

Learned Hand in Haas v. Leo Feist, Inc., 234 F. 105, 108 (S.D.N.Y.

1916)).

The court then applied the rule to Mrs. Kling's case.  The

district court had concluded that Mrs. Kling properly brought her claim

within the three-year statute of limitations under the Copyright Act
because there was no way for her to know of the actual infringement –
the release of the specials on video cassettes – prior to her 1994 trip
to the Blockbuster Video store.  Id. at 1039.  The Ninth Circuit did
not disturb this ruling on appeal.  Id.  Instead, the Ninth Circuit
addressed "the broader question" of whether laches barred Mrs. Kling's
claim because either she or her husband knew or should have known of
"an actual or impending infringement before 1994."  Id.  The court
ultimately concluded that the parties' pre-1994 correspondence created
a triable issue of fact on this issue, denied defendants' summary
judgment motion, and remanded the action for trial.  Id.

    In sum, Kling unequivocally held that the three-year statute of
limitations provided for in the Copyright Act, 17 U.S.C. § 507, does
not preclude a defendant from asserting a laches defense to an
infringement action.  This is true whether or not the infringement
claim is timely filed within the limitations period.

    This rule was affirmed one year later in Danjaq LLC v. Sony
Corporation, 263 F.3d 942 (9th Cir. 2001).  Danjaq was a copyright
infringement suit involving certain films featuring James Bond.[14]  Ian
Fleming was the author of seven books featuring the James Bond
character.  Id. at 947.  In the late 1950s, Kevin O'Donovan McClory
("McClory") was hired (along with others) to transform the books into a
screenplay.  McClory produced the script materials that were the
precursor to the James Bond film Thunderball.  Id. at 948.  In so
doing, McClory purportedly transformed the James Bond character

---

[14]  The factual and procedural background of the Danjaq matter is complicated and
spans several decades.  The Court only summarizes those facts that are necessary to
the discussion here.

originally created by Fleming, who was described as a brooding
alcoholic, to the "cinematic James Bond character" – a charismatic and
marketable adventurer.   Id.   McClory also contended that he added
certain copyrighted elements to the script such as the organization
known as SPECTRE that James Bond battled against in the early films,
the villain Ernst Stavro Blofeld, and the theme of nuclear blackmail.
Id.  McClory eventually acquired at least some of the rights to the
materials developed during the writing of the *Thunderball* script as
well as the copyright to a later novel, *Thunderball*, which was a
derivative work.   See id. at 949.

Over the years, Danjaq LLC acquired the rights to Bond (with the
exception of the rights in *Thunderball*) which were passed on to them by
Fleming and producers Harry Saltzman and Albert "Cubby" Broccoli.   Id.
at 947.   From 1962 to 1999, Danjaq released 18 James Bond movies and
James Bond became a cinematic icon and a huge box office success.   Id.
at 949.   In 1997, McClory brought a claim against Danjaq for copyright
infringement, alleging that eight of the James Bond movies released
from 1962 to 1999 infringed upon his rights by copying certain plot
elements that first appeared in his *Thunderball* works – namely, the
"cinematic James Bond character," SPECTRE, the villain Ernst Stavro
Blofeld, and the theme of nuclear blackmail.   Id.   The district court
held that McClory's claim was barred by the doctrine of laches and the
Ninth Circuit affirmed.   Id. at 950.

While most of McClory's claims fell outside the three-year statute
of limitations (because the films were released decades prior to the
suit), at least some did not.   Id.   Specifically, McClory argued that
*future releases* of the earlier films on DVD constituted separate acts

43

of infringement and that his claim was timely with regard to those subsequent releases. Danjaq, 263 F.3d at 953. The Ninth Circuit rejected this argument, however, because "the allegedly infringing aspect of the DVD is identical to the alleged infringements contained in the underlying movie, [thus] the two should be treated identically for purposes of laches." Id. at 953-54. McClory's decades-long delay in asserting suit as to the original movie releases, which undoubtedly prejudiced Danjaq, served to bar his infringement claim as to later releases of those same films. Id. In reaching this holding, the Ninth Circuit expressly **"reject[ed] McClory's argument that laches may never bar a claim for infringement brought within the statute of limitations."** Id. at 954 (emphasis added). Citing to Kling, 225 F.3d at 1039, the court stated:

> We have already determined that laches may sometimes bar a statutorily timely claim. . . . And, although such an application of laches may be unusual, . . . it is appropriate here. Even *leaving aside the special circumstances of re-releases*, we concluded in any event that McClory's extraordinary delay and the extraordinary prejudice to Danjaq renders laches appropriate despite the statute of limitations.

Id. (internal citations omitted) (emphasis added). In sum, the Copyright Act's three-year statute of limitations does not preclude a successful laches defense. Id.; see also, Jackson v. Axton, 25 F.3d 884, 888 (9th Cir. 1994)(doctrine of laches barred plaintiffs' claim for a declaration of copyright ownership; court held that "laches may apply whether or not the statutory limitations period runs."), *overruled on other grounds by* Fogerty v. Fantasy, Inc., 510 U.S. 517 (1994); see II Paul Goldstein, Goldstein on Copyright § 11:32 (2005)

44

("Laches may be asserted not only in infringement actions but also as a defense to claims of ownership in a copyright.").

Plaintiffs argue that *Kling* and *Danjaq* are not applicable to the infringement claims raised here because both *Kling* and *Danjaq* involved "decades of old issues of copyright ownership" and copyright ownership, unlike copyright infringement, is an equitable claim giving rise to equitable defenses. (Reply at 1-2; Mot. at 4.)  This argument is simply inaccurate.  While it is true that both *Kling* and *Danjaq* *involved* issues of copyright ownership, the Ninth Circuit's rule regarding the laches defense applied directly to claims of *copyright infringement*, not ownership claims.  Indeed, in *Kling*, the Ninth Circuit stated at the outset that it was "proceeding on the assumption that Mary Kling, the widow and successor in interest, owns these copyrights" when deciding "whether the doctrine of laches bars her from filing in 1997 *a claim for infringement*."  225 F.3d at 1032-33 (emphasis added).  So too in *Danjaq*.  In *Danjaq*, while the parties' previous disputes involved ownership claims to copyrights in the *Thunderball* script and novel, which formed the factual backdrop for the discussion, the claim at issue was McClory's claim for infringement of those rights.  263 F.3d at 950 ("The only claim that remain[s] in the suit [is] [McClory's] third cause of action against Danjaq for 'Damages and Profits from Copyright Infringement.'")  *Kling* and *Danjaq* were both infringement suits and the Ninth Circuit expressly applied the laches defense to the infringement claims, notwithstanding the applicable statute of limitations.  Those rulings are controlling here.

The other cases cited by Plaintiffs do not assist them.  Plaintiffs rely in part on *Lyons Partnership, L.P. v. Morris Costumes,*

45

Inc., 243 F.3d 789, 798 (4th Cir. 2001), a copyright infringement action in which the Fourth Circuit held that where Congress has provided for an express statute of limitations period, the court "should not apply laches to overrule the legislature's judgment." Id. In Lyons Partnership, the court ruled that laches could not bar an infringement claim brought within the statute of limitations. Id. But Lyons Partnership is not controlling here. The Court recognizes that a circuit split exists on the issue of whether laches can be applied in a copyright infringement action. See Chirco v. Crosswinds Communities, Inc., 474 F.3d 227, 231-34 (6th Cir. 2007) (discussing circuit split); NIMMER ON COPYRIGHT § 12.06[A] (revised ed. 2009) (same). The Fourth Circuit is recognized as taking the most restrictive view, prohibiting the application of the laches doctrine altogether. Chirco, 474 F.3d at 231-32. As explained above, however, it is a view that the Ninth Circuit (and others) unquestionably does not share. See NIMMER ON COPYRIGHT § 12.06[A] (stating that "laches has an illustrious pedigree across the circuits as a defense to a charge of copyright infringement.") This Court is bound to follow the Ninth Circuit's precedents in Kling and Danjaq.[15]

Furthermore, Miller v. Maxwell's International Inc., 991 F.2d 583 (9th Cir. 1993), is not a copyright infringement case. In Miller, the Ninth Circuit held that the laches defense could not apply to plaintiff's claim under the Age Discrimination in Employment Act ("ADEA") because Congress had provided a two-year statute of limitations to govern ADEA actions. Id. at 586. While the logic in

---

[15] For the same reason, the Court finds that the district court cases cited by Plaintiffs, Zitz v. Pereira, 119 F. Supp. 2d 133, 142 (E.D.N.Y. 1999) and Rushing v. Time Warner, Inc., No. 3:05CV474-H, 2006 WL 517674, *2 (W.D.N.C., March 1, 2006), conflict with binding Ninth Circuit authority and are not persuasive.

1   <u>Miller</u> certainly supports Plaintiffs' argument in a general sense, the

2   Ninth Circuit expressly rejected the same argument in <u>Kling</u> and offered

3   a rational explanation for why laches may apply in a *copyright*

4   *infringement action* even where the statute of limitations has run –

5   i.e., the statute of limitations is based on knowledge of actual

6   infringements whereas the delay requisite for laches can run from

7   knowledge of an anticipated infringement.  Because <u>Kling</u> and <u>Danjaq</u> are

8   directly on point and <u>Miller</u> involves an entirely separate area of the

9   law, the Court follows the former.[16]   Finally, <u>Jarrow  Formulas, Inc. v.</u>

10  <u>Nutrition Now, Inc.</u>, 304 F.3d 829 (9th Cir. 2002), a trademark case

11  under the Lanham Act, merely held that if the claim "is filed within

12  the analogous state limitations period, the strong presumption is that

13  laches is inapplicable."   <u>Id.</u> at 837.   <u>Jarrow Formulas, Inc.</u> did not

14  preclude a laches defense in all circumstances, nor did it do anything

15  to disturb the rulings in <u>Kling</u> and <u>Danjaq</u>.

16      Plaintiffs' final argument (raised for the first time in their

17  reply brief) is that, even assuming the laches defense is not barred in

18  its entirely, the statute of limitations would provide a strong

19  presumption of timeliness and Defendants would have to show

20  extraordinary circumstances to prevail on the laches defense.  (Reply

21  at 2-3.)  That may be true, <u>see Danjaq</u>, 263 F.3d at 952, 954, but

22  whether such "extraordinary circumstances" exist in this case is a

23  highly fact-intensive inquiry that cannot be resolved on a motion to

24  strike.   See <u>Kling</u>, 225 F.3d at 1041 (noting that a claim of laches

25

26

27  _____
    [16]  <u>Green v. City and County of San Francisco Cal.</u>, No. C. 06-6953 SI, 2007 WL
    521240, *2 (N.D. Cal., Feb. 15, 2007) is an employment case under the Fair Labor
28  Standards Act, not a copyright case.

depends on a close evaluation of all the particular facts in a case and is seldom susceptible even to summary judgment.)

For the reasons stated, the Court concludes that laches is an available defense to a copyright infringement action, notwithstanding the applicable statute of limitations.[17]  Defendants' First Amended Answer states a laches defense that is plausible on its face. Accordingly, Plaintiffs' Motion to Strike the Third Affirmative Defense is DENIED.

**VI.   CONCLUSION**

For the reasons stated, Plaintiffs' Motion to Strike the First, Third, Seventh, Eighth, and Ninth Affirmative Defenses IS DENIED.

Plaintiffs' Motion to Strike the Fifth Affirmative Defense is GRANTED WITH LEAVE TO AMEND.  Defendants are granted 20 days from the date of this Order leave to amend the Fifth Affirmative Defense.

Plaintiffs' Motion to Strike the Fourth and Tenth Affirmative Defenses IS GRANTED WITHOUT LEAVE TO AMEND.  The Fourth and Tenth Affirmative Defenses are stricken.

IT IS SO ORDERED.

DATED:    06/28/10

_____
STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE

---

[17] The Court need not determine whether the laches defense is an available defense to Plaintiffs' state law claims.  The Court has concluded that the defense is available in an infringement action brought under the Copyright Act; as such, even if the defense is only a partial defense, it cannot be stricken from the First Amended Answer.